UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
Norfolk Division

M. WRIGHT,

        Plaintiff,

v.                            Case No. 2:19cv189

VIRGINIA PENINSULA REGIONAL
JAIL AUTHORITY, et. al.,

        Defendants.

## OPINION AND ORDER

This matter is before the Court on a Motion for Summary Judgment filed by Defendant John Kuplinski ("Kuplinski"), ECF No. 66, and a separate Motion for Summary Judgment filed by Defendant Virginia Peninsula Regional Jail Authority ("VPRJA"), ECF No. 78, pursuant to Federal Rule of Civil Procedure 56. For the reasons stated below, Kuplinski's Motion for Summary Judgment is **DENIED**. VPRJA's Motion for Summary Judgment is **GRANTED IN PART AND DENIED IN PART**.[1]

### I. FACTUAL AND PROCEDURAL HISTORY

Plaintiff M. Wright ("Plaintiff") was incarcerated at the Virginia Peninsula Regional Jail ("VPRJ"), owned and operated by Defendant VPRJA, from December 27, 2016 through October 17,

---

[1] Both Kuplinski and VPRJA filed requests for a hearing on their respective motions for summary judgment. ECF Nos. 80, 84. The Court finds that such hearings are not necessary as the briefing and accompanying evidence are sufficient for the Court to rule on the pending matters. Accordingly, both requests for a hearing are denied.

2017.  ECF No. 45, at 3.  While Plaintiff was incarcerated at VPRJ in 2017, she was an inmate worker in the laundry unit, which was staffed by both male and female inmates.  ECF No. 67-5, at 18.  Plaintiff asserts that on approximately "ten to fifteen occasions between April 20, 2017 and June 30, 2017," she was sexually assaulted by Defendant Henry Thomas Rhim ("Rhim"), who was a correctional officer at the jail responsible for overseeing the inmate workers assigned to the laundry.  ECF No. 45, at 3.  Plaintiff later reported the assaults and testified against Rhim at his subsequent criminal trial.  See generally ECF No. 94-14.  Rhim was ultimately convicted of two counts each of Carnal Knowledge of an Inmate by an Employee and Sexual Battery of an Inmate by an Employee in the Williamsburg/James City County Circuit Court.  ECF No. 79-24, at 13-14.

Plaintiff brought this action on April 16, 2019, against VPRJA, as well as three individual defendants who were employed by VPRJA at the relevant times: Defendant Rhim; Defendant Kuplinski, who was the Superintendent and designated Prison Rape Elimination Act ("PREA") Coordinator of VPRJ, ECF No. 67, at 3; and J. Randall Wheeler ("Wheeler"), who was the Chairman of the VPRJA Board of Directors in 2016.  ECF No. 1.  The Amended Complaint alleges seven counts: Count I against VPRJA, Kuplinski, and Wheeler pursuant to 42 U.S.C. § 1983; Count II against Rhim also pursuant to § 1983; Count III against Rhim for

2

assault and battery; Count IV against VPRJA for assault and battery under a theory of respondeat superior; Count V for negligence against VPRJA, Kuplinski, and Wheeler; Count VI for intentional infliction of emotional distress against Rhim; and Count VII for intentional infliction of emotional distress against VPRJA under a theory of respondeat superior. ECF No. 45. VPRJA and Wheeler (filing jointly) and Kuplinski (filing separately) filed motions to dismiss all of the claims against them. ECF Nos. 31, 34. This Court dismissed Count I as to Kuplinski; dismissed no counts as to VPRJA; and dismissed all counts (Counts I and V) against Wheeler, thereby terminating him as a Defendant in this action. See ECF No. 59.

On July 17, 2020, Defendant Kuplinski filed a Motion for Summary Judgment with respect to the sole remaining count against him for negligence in Count V. ECF No. 66. On August 5, 2020, VPRJA filed a separate Motion for Summary Judgment with respect to all four counts pending against it: Counts I, IV, V, and VII. ECF No. 78. Plaintiff filed her responses in opposition to Kuplinski's motion, ECF No. 81, and VPRJA's motion, ECF No. 94, on August 7, 2020, and August 25, 2020, respectively. Kuplinski filed his reply on August 13, 2020, ECF No. 83, and VPRJA filed its reply on September 1, 2020, ECF No. 101. Accordingly, this matter is ripe for review.

## II. STANDARD OF REVIEW

Federal Rule of Civil Procedure 56 permits summary judgment when the Court, viewing the record as a whole and in the light most favorable to the non-moving party, determines that there exists no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. Celotex Corp. v. Catrett, 477 U.S. 317, 322-24 (1986); Bouchat v. Balt. Ravens Football Club, Inc., 346 F.3d 514, 521-22 (4th Cir. 2003); Fed. R. Civ. P. 56(c). The moving party bears the initial burden of showing that summary judgment is appropriate by providing evidence illustrating the absence of any genuine issue of material fact. Celotex, 477 U.S. at 322-24; Bouchat, 346 F.3d at 522. Once such a showing has been made, the non-moving party is not permitted to merely rest upon the pleadings but must instead provide exhibits or sworn affidavits illustrating specific facts that remain in dispute and justify the matter proceeding to trial. Celotex, 477 U.S. at 322-24; Bouchat, 346 F.3d at 522.

When considering affidavits and exhibits at the summary judgment stage, the facts must be viewed in the light most favorable to the non-moving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986) (citing Adickes v. S.H. Kress & Co., 398 U.S. 144, 158-59 (1970)). The non-moving party must also receive the benefit of all reasonable inferences. Id.

(citing Adickes, 398 U.S. at 158-59).   After reviewing the record, a court must assess whether, in light of the parties' respective burdens, "no genuine issue of material fact" exists. Id. at 248 (emphases in original).   If it appears that "a reasonable jury could return a verdict for [the non-moving party], then a genuine factual dispute exists and summary judgment is improper."   Evans v. Techs. Applications & Serv. Co., 80 F.3d 954, 959 (4th Cir. 1996).   Importantly, "at the summary judgment stage, the judge's function is not . . . to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." Anderson, 477 U.S. at 249; see also id. at 250 ("The inquiry performed is the threshold inquiry of determining whether there is the need for a trial—whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party.").

### III. DISCUSSION

As noted above, Kuplinski and VPRJA move for summary judgment on each of their respective remaining Counts.   As such, the Court will address each count in turn.

### A. Count V: Negligence Against Kuplinski and VPRJA

Under Virginia law, to prove a negligence claim, a plaintiff must show the existence of a duty,[2] a breach of that duty, causation, and damages.  Burdette v. Marks, 244 Va. 309, 311 (1992).  Kuplinski contends that he is entitled to summary judgment because no reasonable jury could conclude that Rhim's alleged assaults against Plaintiff were "known or reasonably foreseeable to Kuplinski," nor could any reasonable jury conclude that Kuplinski "breached any common law duty he owed to Plaintiff."  ECF No. 67, at 3.  VPRJA argues that it is entitled to summary judgment "because a reasonable jury could conclude only that VPRJ officials acted with the degree of care ascribable to a reasonable jail official."  ECF No. 79, at 28. The Court addresses each contention in turn.

---

[2] This Court previously noted in its March 4, 2020 Opinion and Order, ECF No. 59, that the Virginia Supreme Court has not specifically addressed the duty of care owed by a prison official to a prisoner.  Id.  In that Opinion, this Court thoroughly discussed Virginia's recognition in other contexts of a special duty owed by a custodian to a vulnerable individual in his or her custody, comparable decisions from other jurisdictions, and applicable provisions of the Second Restatement of Torts.  See id. at 41-45.  Based on this, the Court found that the allegations contained in the Amended Complaint were sufficient to "demonstrate a special relationship with Defendants Kuplinski and VPRJA to satisfy the duty element of [Plaintiff's] negligence claim at th[e] [motion to dismiss] stage."  Id. at 45.  Neither Kuplinski nor VPRJA challenges this finding at the summary judgment stage.  See ECF No. 79, at 28 (VPRJA only addressing the issue of reasonable care); ECF No. 67, at 16 ("For purposes of the present motion, Kuplinski will assume that a custodian/vulnerable person special relationship existed between him and Plaintiff.").

6

**1. Foreseeability**

A custodian has a duty to protect a vulnerable person in his custody if "the danger is either known or reasonably foreseeable" to the custodian. <u>A.H. ex rel. C.H. v. Church of God in Christ, Inc.</u>, 297 Va. 604, 621 (2019) (internal quotation marks and citation omitted). Kuplinski argues that because Rhim's assaultive conduct was not reasonably foreseeable to him, Plaintiff's claim fails as a matter of law. ECF No. 67, at 3. Plaintiff, on the other hand, contends that a triable issue exists as to whether the risk of assault by Rhim was foreseeable because Kuplinski was aware of both (1) the general risk of sexual assault at VPRJ due to "approximately ten [prior] confirmed and/or suspected inciden[ts] of sexual misconduct by guards involving inmates" and (2) of the particular risk Rhim posed to inmates due to a "special investigation of Rhim done at Kuplinski's request" in October of 2014. ECF No. 81, at 3–4.

Turning first to the previous assaults at VPRJ, the evidence shows that, in the thirteen-year period preceding the alleged assaults on Plaintiff, Kuplinski was aware of at least five prior substantiated incidents in which female prisoners were sexually assaulted by male guards: a January 2004 incident with Officer Steele; an August 2011 incident with Officer Kelly Willhoite; two February 2012 incidents with Officer Kelly Willhoite; and a June 2014 incident with Officer Alexander

7

Koehler.    ECF  No.  81-4,  at  34-38;  see  also  Heywood  v.  Va.
Peninsula  Reg'l  Jail  Auth., 217  F.  Supp.  3d  896,  902  (E.D.  Va.
2016)  (describing  Kuplinski's  deposition  testimony  regarding
prior  incidents  at  VPRJ).

However,  Kuplinski  maintains  that  "none  of  the[se]
incidents  of  alleged  sexual  misconduct  preceding  Plaintiff's
claim  occurred  in  the  laundry  or  involved  Rhim."  ECF  No.  67,  at
7;  ECF  No.  67-1,  at  72.    According  to  Kuplinski,  all  of  the
previous  incidents  occurred  in  the  medical  unit.  ECF  No.  67-1,
at  72.    Therefore,  Kuplinski  contends  that  he  could  not  have
reasonably  foreseen  that  Rhim  would  assault  Plaintiff  in  the
laundry  room.    ECF  No.  67,  at  20.    In  support  of  this
contention,  Kuplinski  primarily  relies  on  A.H.  v.  Rockingham
Publishing  Co., 255  Va.  216  (1998),  where  the  Virginia  Supreme
Court  held  that  a  sexual  assault  by  a  third  party  on  a  minor
plaintiff  was  not  foreseeable  to  the  plaintiff's  employer.    In
that  case,  the  plaintiff,  a  minor  paper  boy  employed  by  a
publisher,  was  sexually  assaulted  while  delivering  newspapers  on
his  regular  route  by  a  then-unidentified  young  man.    Id. at  219.
The  court  reasoned  that  although  the  employer  knew  about  three
prior  sexual  assaults  on  other  young  carriers,  the  plaintiff's
assault  was  not  foreseeable  because  it  was  "not  a  case  in  which
it  was  shown  that  the  prior  assaults  were  at  or  near  the
location  of  the  plaintiff's  assault,  or  that  they  occurred

frequently or sufficiently close in time to make it reasonably foreseeable that the plaintiff would be similarly assaulted." Id. at 222.

The facts of the instant case are materially distinguishable from Rockingham Publishing Co. in two respects. First, in Rockingham Publishing Co., the prior assaults occurred along different delivery routes in different parts of the city that were not on or near the plaintiff's route. Id. at 219. Here, the prior assaults all occurred at the same location: VPRJ. ECF No. 67-1, at 72. Kuplinski, nevertheless, asserts that the relevant location for the Court's analysis is the specific locations within VPRJ rather than the VPRJ as a whole. Specifically, Kuplinski contends that because the prior assaults occurred in a different location of the jail (the medical unit), Plaintiff's assault in the laundry room within the same jail was not reasonably foreseeable. ECF No. 67, at 22. Even if the Court were to take such a granular view of the relevant locations, the prior assaults in the medical unit would still certainly have occurred near the location of the Plaintiff's assault as all of the assaults happened within the VPRJ. Moreover, when the facts are viewed in Plaintiff's favor as required at this stage of the proceedings, both the medical unit and the laundry room are the same type of location as they share a distinct commonality. According to Kuplinski's deposition

9

testimony, the medical unit and the laundry room were the only locations within the jail that did not have security cameras. ECF No. 81-4, at 31. However, after the June 2014 Koehler assault in the medical unit, "security cameras were installed in the VPRJ's medical unit." ECF No. 67-3, at 2. As such, even though all of the prior assaults occurred in the medical unit, a jury could conclude that Kuplinski had reason to foresee a danger of similar assaults in the laundry room—which was, at all relevant times, the sole remaining area in the jail with no cameras.

Second, unlike in Rockingham Publishing Co., there is evidence from which a jury could conclude that Kuplinski was made aware of the particular risk that Rhim posed to female inmates in the laundry room. In October 2014, Corporal Ronald Roth ("Roth"), VPRJ's Internal Affairs Investigator, received an allegation that Rhim and a female inmate, Encela Pardo, were seen coming out of a closet together in the laundry area (the "October 2014 incident"). ECF No. 81-1, at 1. As this would have been a violation of policies on cross-gender supervision in the laundry room, Roth notified Kuplinski of these allegations and was told to investigate further. Id. In a memorandum written by Roth and addressed to Kuplinski, ECF No. 81-1 ("2014 Roth Report"), Roth notified Kuplinski of additional allegations that were reported by several female inmates during the

10

interviews Roth conducted.  It was alleged that inmate Pardo was seen coming out of the closet with Rhim in the laundry room; that inmate Pardo "goes to laundry by herself some mornings" and that "[a]lmost all the time Pardo stays in laundry after the males and females are sent back to the pod, sometimes up to twenty minutes"; that Rhim was showing inmate Pardo preferential treatment, including allowing "her [to] run things in the laundry," calling her by her "first name," bringing her "coffee creamers," putting "money on someone's books for her to order canteen," and overall "treat[ing] her different[ly]"; and that inmate Pardo stated that another former female inmate who received preferential treatment from Rhim would come back from the laundry room "with things you can't get in the jail," and that when inmate Pardo asked how she obtained such items, she responded that "it was better if she did not know."  Id.  When Roth interviewed inmate Pardo, she admitted to being alone in the laundry room with Rhim on several occasions but stated that "nothing inappropriate ha[d] happened."  Id.  Roth noted that while interviewing inmate Pardo, she was "very upset, [and] at some points [was] crying hysterically."  Id.  Notably, Roth stated in his report that he thought "Rhim made bad decisions for allowing himself to be placed in a situation where he was alone with a female and a[n] allegation of misconduct could have been made."  Id. at 2.  Rhim admitted to being alone with inmate

11

Pardo and ultimately received a written reprimand in which he
was instructed that "he is not to be in the laundry with only
the female workers" as it is a violation of cross-gender
supervision policy in the laundry room.  ECF No. 67-7, at 4; see
also ECF No. 94-8, at 31 (Rhim testifying in his deposition that
there were times where there would only be female inmates in the
laundry room and that he was the sole supervisor).

      Viewing the evidence in the light most favorable to
Plaintiff, a jury could reasonably conclude that the 2014 Roth
Report specifically alerted Kuplinski to a particular risk of
assault in the laundry room, to include the specific risk posed
by Rhim's failure to follow established procedures.  As noted
above, the allegations involving Pardo arose only four months
after the June 2014 Koehler assault that led Kuplinski to
install cameras in the medical unit.  At the time of the 2014
Roth Report and the subsequent assaults on Plaintiff, the
laundry room was the sole remaining area without cameras, and it
was being supervised by Rhim—a lone male guard who admitted to
being alone with female inmates on several other occasions.  ECF
No. 67-7, at 4; ECF No. 94-8, at 31.  Therefore, given the
particular implications of the 2014 Roth Report coupled with the
fact that the prior assaults all occurred in a similarly
unsurveilled area, a reasonable jury could conclude that
Kuplinski had "reason to foresee the danger [of assault] or

otherwise to know that precautions are called for" in the laundry room. Rockingham Publ'g Co., 255 Va. at 221 (internal quotation marks and citation omitted). Accordingly, the Court finds that there is sufficient evidence to create a jury issue as to the foreseeability of the assaults on Plaintiff.

### 2. Reasonable Care

"Negligence is generally a jury issue; '[o]nly when reasonable minds could not differ does the issue become one of law to be decided by a court.'" Heywood, 217 F. Supp. 3d at 903 (alteration in original) (quoting Artrip v. E.E. Berry Equip. Co., 240 Va. 354, 397 (1990)). Both Kuplinski and VPRJA, claim that such is the case here because the undisputed facts demonstrate that each party acted reasonably. The Court disagrees.

First, Kuplinski asserts that he "was not responsible for directly supervising Rhim, Plaintiff, or the laundry area," and that other VPRJ employees were responsible for "performing initial investigations into allegations of misconduct." ECF No. 67, at 25. However, there is evidence that contradicts this assertion. The 2014 Roth Report was addressed specifically to Kuplinski. See ECF No. 81-1. In the Report, Roth states that he "notified Mr. Kuplinski and was told [by Kuplinski] to look into the allegations." Id. at 1. In his deposition, Kuplinski testified that he also personally made the decision whether to

13

investigate the allegations in the 2014 Roth Report further. ECF No. 81-4, at 16. Moreover, as Superintendent of VPRJ, Kuplinski had the power to approve or disapprove the recommended disciplinary action against Rhim and exercised such authority by approving Rhim's written reprimand. Id. at 4-5. Therefore, a jury could reasonably conclude from this evidence that Kuplinski was indeed directly involved with Rhim's supervision of the laundry room.

Second, Kuplinski asserts that the actions he took regarding Rhim's discipline and providing for the female inmates' safety in the laundry room after the October 2014 incident were sufficient because the 2014 Roth Report contained "unverified allegations" that did not indicate that sexual assault occurred. ECF No. 67, at 26. Whether Kuplinski's actions after the October 2014 incident were sufficiently reasonable is an issue more appropriately resolved by a jury. Indeed, "at the summary judgment stage, the judge's function is not . . . to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." Anderson, 477 U.S. at 249. Here, such a genuine issue exists as there is evidence upon which a jury could reasonably find that Kuplinski acted negligently. First, while Kuplinski asserts that none of the allegations in the 2014 Roth Report was verified, there are statements in the Report that, when viewed

14

in the light most favorable to Plaintiff, suggest that Kuplinski did not conduct a full investigation into the allegations. The Report states in relevant part:

> <u>At this point in the investigation, without talking to officer Rhim</u> I think Rhim made bad decisions for allowing himself to be placed in a situation where he was alone with a female and a[n] allegation of misconduct could have been made. After my interviews I found it was purely speculation about him putting money on someone's account[;] the inmates admitted they just assumed that because Pardo was getting canteen. It appears the only thing Rhim has brought into the inmates is coffee creamers which were shared among the female laundry workers. If the above information warrants it and <u>you want me to proceed with the investigation</u> I can interview the male laundry workers and officer Rhim.

ECF No. 81-1, at 2 (emphases added). Kuplinski also concedes in his brief that Roth's investigation was an "<u>initial</u> inquiry" and that "he did not instruct Roth to interview Rhim or the male laundry workers" because he "did not believe that <u>further investigation</u> was necessary." ECF No. 67, at 9 (emphases added). Accordingly, a jury could conclude that the evidence does not demonstrate that the allegations were unverified but rather that they were simply not fully investigated.

Moreover, it is undisputed that, on several occasions in October 2014, Rhim was alone with female inmates in the laundry room in violation of VPRJ's policy on cross-gender supervision in the laundry room. ECF No. 81-13, at 2; ECF No. 81-1, at 1. Rhim also testified in his deposition that, for a reason he could not remember, he was instructed again by his immediate

15

supervisor "in 2016" or as early as 2015 to not be alone with female inmates in the laundry. ECF No. 94-8, at 41-42. Despite this, Kuplinski testified in his deposition that after the October 2014 incident, he took no specific preventative measures, such as installing cameras in the laundry room or reassigning Rhim to a position outside of the laundry room. ECF No. 81-4, at 6, 23-26. Nor did Kuplinski take any specific measures to ensure that Rhim was complying with the policy to never be alone with female inmates in the laundry room. Id. at 21; ECF No. 67, at 11. Therefore, viewing the evidence as a whole and in the light most favorable to Plaintiff, a jury could reasonably conclude that Kuplinski and VPRJA failed to make reasonable efforts to provide for Plaintiff's safety.[3] Because "there is reason to believe that the better course would be to proceed to a full trial" on this issue, Anderson, 477 U.S. at 255, the Court **DENIES** both Kuplinski's and VPRJA's motions for summary judgment as to Count V.

## B. Count I: Municipal Liability Against VPRJA

Next, VPRJA contends that it is entitled to summary judgment as to Plaintiff's § 1983 claim in Count I because

---

[3] In his brief and deposition testimony, Kuplinski provides several explanations for why he took no additional preventative measures after the October 2014 incident. See ECF No. 67, at 10-11. While such explanations appear reasonable on their face, they are not suitable for resolution at the summary judgment stage as this Court is only conducting a "threshold inquiry" to determine whether there are sufficient facts to support submission of the case to a jury. Anderson, 477 U.S. at 250.

Plaintiff has failed to establish "that VPRJA maintain[s] an unconstitutional custom, policy, [or] practice." ECF No. 79, at 14. VPRJA also claims that Plaintiff cannot establish that "VPRJA took any deliberate action that caused Rhim to assault [P]laintiff." Id. at 18. The Court agrees.

"First, it is well established that a municipality cannot be held liable simply for employing a tortfeasor." Riddick v. Sch. Bd., 238 F.3d 518, 522 (4th Cir. 2000) (citing Monell v. Dep't of Soc. Servs., 436 U.S. 658, 691 (1978)). In order to subject a municipality to liability under § 1983, a plaintiff must show that the municipality caused a deprivation of a federal statutory or constitutional right "through an official policy or custom." Carter v. Morris, 164 F.3d 215, 218 (4th Cir. 1999). The unconstitutional official policy or custom can arise in four ways:

> (1) through an express policy, such as a written ordinance or regulation; (2) through the decisions of a person with final policymaking authority; (3) through an omission, such as a failure to properly train officers, that "manifest[s] deliberate indifference to the rights of citizens"; or (4) through a practice that is so "persistent and widespread" as to constitute a "custom or usage with the force of law."

Lytle v. Doyle, 326 F.3d 463, 471 (4th Cir. 2003) (alteration in original) (quoting Carter, 164 F.3d at 217). The plaintiff must also show that such policy or custom is "the moving force behind the particular constitutional violation." Spell v. McDaniel,

17

824 F.2d 1380, 1387 (4th Cir. 1987) (internal quotation marks and citation omitted).

Here, the purportedly unconstitutional custom or policy identified by Plaintiff is that of unchaperoned male guards supervising female inmates in the laundry. ECF No. 94, at 26. Specifically, Plaintiff contends that "consigning a woman trustee to work alone with Rhim in the laundry was tantamount to a sentence of rape." Id. at 31. Another judge of this Court has recently considered and rejected an identical argument in Heywood, where the plaintiff argued that VPRJA's policy of allowing "unchaperoned male guards [to] supervis[e] female inmates in the medical unit" was the proximate cause of her sexual assault. 217 F. Supp. 3d at 903. The Court concluded that, without more, "it is not unconstitutional" to "leave female inmates alone with male correctional officers." Id.; see also Doe v. Cunningham, No. 3:06cv19, 2006 WL 2819600, at *2 (W.D. Va. Sept. 28, 2006) ("The Court finds a policy or custom of transporting female inmates alone with male guards is not unconstitutional, because the majority of men, and the majority of prison guards, are not rapists merely waiting for an opportunity to assault a woman."); Heckenlaible v. Va. Peninsula Reg'l Jail Auth., 491 F. Supp. 2d 544, 555 n.6 (E.D. Va. 2007) (agreeing with the Cunningham court's reasoning). For the same reasons articulated in Heywood, Cunningham, and Heckenlaible,

18

this Court similarly finds that a policy that allows unchaperoned male guards to supervise female inmates, without more, is not unconstitutional.[4]

Plaintiff, however, contends that VPRJA, through the actions of Kuplinski, "demonstrated deliberate indifference" by failing to complete the October 2014 investigation into Rhim and failing to take preventative measures in the laundry room such as installing cameras, replacing Rhim with another guard, or putting a second guard in the laundry room. ECF No. 94, at 26-27. "[W]hen assessing allegations of municipal omission involving deliberate indifference, . . . 'rigorous standards of culpability and causation must be applied.'" <u>Heywood</u>, 217 F. Supp. 3d at 902 (quoting <u>Bd. of Cnty. Comm'rs v. Brown</u>, 520 U.S. 397, 405 (1997)). In establishing culpability, the plaintiff must show that "a municipal decision reflects deliberate indifference to the risk that a violation of a particular constitutional or statutory right will follow the decision." <u>Brown</u>, 520 U.S. at 411. If the requisite degree of culpability is shown, the plaintiff must then show "a direct causal link between the municipal action and the deprivation of federal rights." <u>Id.</u> at 404.

---

[4] This Court further notes that, as discussed herein, VPRJA's policy actually prohibits unchaperoned male guards from supervising only female inmates in the laundry room. ECF No. 79-17, at 4.

The Fourth Circuit's analysis in Riddick is instructive as the facts in Riddick are remarkably similar to those here.  In Riddick, the plaintiffs, who were members of a track team, brought a § 1983 suit against their school board after it was discovered that the track team's coach set up a hidden video camera in the women's locker room and secretly videotaped members of the track team in various stages of undress. Riddick, 238 F.3d at 521.  In support of their municipal liability claim, the plaintiffs relied on a previous incident, which had occurred three years prior, involving a complaint that a track member's parent made against the track coach for inappropriately videotaping their daughter posing in her track uniform.  Id.  After an investigation of the earlier incident, the school board concluded that the track coach's behavior was not objectionable but directed him to confine videotaping to track meets, refrain from driving team members home after practices, and to take a female chaperone to meets outside the school district.  Id. at 522.

The plaintiffs asserted that the board's decision to retain the track coach and "its related failure to implement sufficient precautionary measures to prevent future improper conduct by him" demonstrated deliberate indifference that resulted in the deprivation of their constitutional rights.  Id. at 522.  In affirming the district court's grant of summary judgment in

favor of the board, the Fourth Circuit concluded that when the board investigated the track coach for "openly filming fully-clothed female students, it was not plainly obvious that he would videotape other students with a hidden camera nearly three years later" as there was no indication that anyone could predict that he would engage in such egregious conduct. Id. at 525. And while the Fourth Circuit noted that the board's decision "was unfortunate and perhaps ill-advised," such "short-sightedness d[id] not suffice to establish deliberate indifference." Id. at 526.

Similarly, here, there is no evidence upon which a jury could conclude that VPRJA acted with deliberate indifference to a plainly obvious risk or that VPRJA had any indication that Rhim would engage in such assaultive conduct. To be sure, it is undisputed that while investigating the October 2014 incident, inmate Pardo admitted to being alone in the laundry room with Rhim. However, Pardo told Investigator Roth that "nothing inappropriate ha[d] happened." ECF No. 94-1, at 1. Rhim also denied having any "sexual contact with any female inmate" when he was asked by his immediate supervisor, and he was instructed that "he is not to be in the laundry with only the female workers." ECF No. 79-20, at 2. Moreover, according to Kuplinski's deposition testimony, Rhim "had no [prior] history of disciplinary action" and all of his evaluations dating back

21

to when he was first hired "exceed[ed] expectations." ECF No. 67-1, at 36. Accordingly, there is no evidence upon which a jury could find that VPRJA's decision not to replace Rhim with another guard or increase surveillance in the laundry room amounted to deliberate indifference to a known risk. Nor is there evidence upon which a jury could conclude that it was plainly obvious to VPRJA that Rhim would subsequently assault Plaintiff nearly three years later in 2017.[5]

Even viewing the evidence in the light most favorable to Plaintiff, a reasonable jury could at most find that VPRJA's conduct was negligent. But "mere negligence on the part of policymakers is not sufficient" to impose municipal liability on VPRJA. Spell, 824 F.2d at 1390. As the Fourth Circuit has explained, "[w]ith the benefit of hindsight," the decisions of a municipality may be "clearly unfortunate, . . . be thought imprudent, or even be found legally negligent, but that does not suffice." Jones v. Wellham, 104 F.3d 620, 627 (4th Cir. 1997). Only those "decisions taken with deliberate indifference to the potential consequences of known risks" can impose municipal

---

[5] Kuplinski contends, and Plaintiff does not dispute, that prior to Plaintiff's reports in 2017, Kuplinski was not aware of any other sexual misconduct allegations against Rhim. ECF No. 67-1, at 73. Plaintiff also does not dispute that by the time she reported Rhim's assaults, Rhim had already announced his retirement and was no longer working at the jail. ECF No. 81, at 11 n.3. Moreover, Plaintiff does not dispute that, after the internal PREA investigation was completed, Kuplinski notified the appropriate authorities, which led to Rhim's subsequent arrest, trial, and conviction. Id. As such, Plaintiff cannot show that VPRJA, through the actions of Kuplinski, authorized, approved, or knowingly acquiesced in Rhim's alleged unconstitutional conduct.

22

liability.  Id.  Based on the evidence, there is simply no showing of an unconstitutional VPRJA policy or custom nor of a decision that VPRJA made that demonstrates deliberate indifference.  Accordingly, VPRJA's motion for summary judgment as to Count I is **GRANTED**.

### C. Counts IV & VII: Respondeat Superior Liability Against VPRJA

Lastly, VPRJA contends that it is entitled to summary judgment on Plaintiff's respondeat superior claims in Counts IV and VII because the undisputed facts show "that Rhim was acting outside the scope of his employment with VPRJA."  ECF No. 79, at 20.  The Court disagrees and finds that this is an issue for the jury to resolve.

In Virginia, "an employer is liable for the tortious act of his employee if the employee was performing his employer's business and acting within the scope of his employment."  Parker v. Carilion Clinic, 296 Va. 319, 335 (2018) (citation omitted). An act is within the scope of employment if:

> (1) it was expressly or impliedly directed by the employer, or is naturally incident to the business, and (2) it was performed, although mistakenly or ill-advisedly with the intent to further the employer's interest, or from some impulse or emotion that was the natural consequence of an attempt to do the employer's business, and did not arise wholly from some external, independent, and personal motive on the part of the [employee] to do the act upon his own account.

*Kensington Assocs. v. West*, 234 Va. 430, 432 (1987) (alteration in original) (internal quotation marks and citation omitted). Once a plaintiff establishes the existence of an employment relationship, a rebuttable presumption of the employer's liability arises, and the employer has the burden to prove that the employee was not acting within the scope of employment when the tortious act was committed. *Gina Chin & Assocs., Inc. v. First Union Bank*, 260 Va. 533, 542 (2000).

The issue of whether VPRJA is liable to an inmate for the sexual misconduct of a correctional officer has already been addressed in this court. *See Heckenlaible*, 491 F. Supp. 2d at 448-52; *Heywood*, 217 F. Supp. 3d at 900-01. In *Heckenlaible*, the court found that the officer's duties required him to observe the plaintiff inmate in the shower and that after this observation, he had a sexual encounter with the plaintiff in her cell under the pretense of conducting a cell search. 491 F. Supp. 2d at 551-52. Based on these facts, the court concluded that whether the officer acted in the scope of his employment was a jury issue because he "arguably used the authority of his office to accomplish the wrongful act." *Id.* at 552. In *Heywood*, the officer had asked an inmate worker to clean VPRJ's medical unit, and after she arrived, he engaged in sexual intercourse with her. 217 F. Supp. 3d at 898. As in *Heckenlaible*, the court also found that the scope of employment

24

issue was for the jury to resolve because the officer "was engaged in the service of supervising an inmate, which was within the ordinary course of the Jail Authority's business." Id. at 901.

VPRJA contends, however, that the Virginia Supreme Court's recent clarification of its respondeat superior doctrine in Our Lady of Peace, Inc. v. Morgan, 297 Va. 832 (2019), warrants a different conclusion than those reached in Heywood and Heckenlaible. ECF No. 79, at 24-25. In Our Lady of Peace, Inc., the court "observed that the low-resolution nature" of its current respondeat superior doctrine "leads to difficulties in its application and often presents conceptually vexatious and perplexing questions." 297 Va. at 844 (internal quotation marks and citation omitted). As such, the court clarified that in deciding whether the actor's scope of employment is a jury issue, courts must consider both the employee's motive and conduct "in tandem" and that "[i]n that conjoined equation, the variable of motive can be decisive in any given case." Id. at 846. It is only when "the motive of the actor is clear" and the employee's deviation from the employer's business is "marked and unusual, as opposed to slight," with "both being so factually incontestable that no reasonable juror could disagree," that the question "is no longer one of fact for the jury but one of law

for the court." Id. (emphasis added) (internal quotation marks and citations omitted).

Here, even under the clarified standard articulated in Our Lady of Peace, Inc., Rhim's motives and conduct are not so "factually incontestable that no reasonable juror could disagree." Id. First, it is undisputed that Rhim was actively engaged in supervising Plaintiff during each of the alleged assaults. Plaintiff testified in her deposition that on some occasions when Rhim assaulted her, he would send the male workers back and require Plaintiff to stay behind with him alone. ECF No. 94-4, at 33. Plaintiff also testified that Rhim would always use "his authority" to intimidate her and get her to acquiesce to his assaultive conduct. Id. at 24. Lastly, Plaintiff testified that Rhim told her that if she ever told anybody about the assaults, she would not be believed because of "how long he ha[d] been working at the jail." Id. at 26. Thus, "the instant case reflects a situation where special circumstances related to employment facilitated the alleged intentional tort" as Rhim "arguably used the authority of his office to accomplish the wrongful act."[6] Heckenlaible, 491 F. Supp. 2d at 552.

---

[6] VPRJA contends that Rhim acted outside the scope of his employment during these assaults because "Rhim's job responsibilities as the laundry officer did not include touching female inmates," which is reflected in the VPRJ policy that only allows for pat downs by an officer of the same sex. ECF No. 79, at 25. However, according to the Laundry Post Order,

Second, there is evidence that on one occasion, Rhim committed a tortious act "from some impulse or emotion that was the natural consequence of an attempt to do [VPRJA's] business." Kensington Assocs., 234 Va. at 432. In her deposition, Plaintiff described an incident where she was standing on a chair putting up clothes when Rhim came behind her and fondled her buttocks. ECF No. 94-4, at 36. During the criminal investigation, Rhim referred to the same event and told the investigators that Plaintiff "was standing on a chair putting blankets away and he put his hands on her waist to make sure she did not fall from the chair." ECF No. 94-18, at 1. Plaintiff disputes both the nature of the touching and the need for any contact, claiming that she did not need assistance because she "was sturdy" on the chair. ECF No. 94-4, at 36. This factual dispute weighs heavily against resolving, as a matter of law, the scope of employment issue in favor of VPRJA because Rhim's subjective motivations are unclear and a jury could conclude that he "committed the tort while actively engaged in a job-

---

"[t]he Laundry Officer or an Officer of the same sex [must] search[] the inmate workers prior to returning to the designated housing unit." ECF No. 79-17, at 5 (emphasis added). Therefore, it appears that VPRJ's policy does allow for some form of limited cross-gender touching by the Laundry Officer because the laundry room is staffed with both male and female inmates. "Also, an employer need not impliedly or expressly direct the wrongful act, and a jury issue may exist as to whether an employee's wrongful act occurred within the scope of employment notwithstanding the fact that the employee's act violated an employer's rules or directives." Heckenlaible, 491 F. Supp. 2d at 549 (citing Gina Chin & Assocs., 260 Va. at 544).

related service."[7]  Parker, 296 Va. at 339.  In sum, based on the evidence viewed in the light most favorable to Plaintiff, whether Rhim was acting within the scope of his employment is an issue for the jury to resolve.  Accordingly, VPRJA's motion for summary judgment on Count IV and Count VII is **DENIED.**

### IV. CONCLUSION

For the reasons stated above, Kuplinski's motion for summary judgment is **DENIED.**  ECF No. 66.  VPRJA's motion for summary judgment is **GRANTED** as to Count I and **DENIED** as to Counts IV, V, and VII.  ECF No. 78.  The Clerk is **REQUESTED** to send a copy of this Opinion and Order to all counsel of record.

**IT IS SO ORDERED.**

/s/

Mark S. Davis
CHIEF UNITED STATES DISTRICT JUDGE

Norfolk, Virginia
March  15 , 2021

---

[7] The instant case is also distinguishable from Lett v. Great Eastern Resort Management, Inc., 435 F. Supp. 3d 700, 704 (W.D. Va. 2020), which VPRJA relied on in its briefing, because in Lett, there was evidence that the employee had a purely personal motive when he inappropriately fondled the plaintiff during a massage, which demonstrated that he was not acting in the scope of his employment.  Here, Rhim stated that his personal motive in touching Plaintiff on at least one occasion was to ensure her safety and keep her from falling off the chair.  Therefore, this Court cannot conclude as a matter of law that Rhim's motive is determinative in this case.